UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

INTERNATIONAL SHIP REPAIR
& MARINE SERVICES, INC.,

    Plaintiff,

v.                                         Case No. 8:19-cv-605-T-36CPT

BARGE B. 215,

    Defendant.
_____/

**O R D E R**

Before the Court are the *Defendant's Motion to Vacate Arrest and Request for Prompt Hearing* (Doc. 19) and the *Defendant's Motion to Set Security and Counter Security* (Doc. 26). For the reasons discussed below, the Defendant's motion to vacate is denied and its motion to set security and countersecurity is granted in part and denied in part.

I.

Plaintiff International Ship Repair & Marine Services, Inc. (ISR) initiated this *in rem* action in March 2019, claiming a maritime lien against the vessel, Barge B. 215 (the Barge). The Barge is owned by B. No. 215 Corporation (B. 215 Corp.) and managed by Bouchard Transportation Co. Inc. (Bouchard). Although not a

defendant in this action, B. 215 Corp. has appeared in defense of the Barge and has asserted counterclaims for wrongful arrest and breach of contract.

The genesis of this dispute dates back to sometime prior to November 2018, when the American Bureau of Shipping (ABS) inspected and surveyed the Barge for seaworthiness and classification in South Carolina. The United States Coast Guard delegates to ABS certain responsibilities with respect to examining and certifying vessels, like the Barge, for operation. As a result of its inspection and survey, ABS recommended that the Barge proceed to a shipyard for repairs and an overall deck assessment.

The Barge was then sent to Gulf Marine Repair in Tampa, which began the deck assessment project by blasting the main deck down to bare steel and performing gauging to determine the steel's thickness. The Barge was subsequently moved to ISR's facility because ISR provided a better quote for the project.

On November 29, 2018, Bouchard and ISR entered into a written contract for repair work at the agreed-upon amount of $4,200,000. That repair work consisted chiefly of ISR purchasing, pre-fabricating, installing, and welding replacement steel plates on the Barge's deck. The contract limited the repairs to those identified in a deck replacement plan, and included a "no growth" clause requiring Bouchard's advance approval for any additional work not covered by the contract.

The contract also obligated ISR to complete the agreed-upon repairs and deliver the Barge to Bouchard by February 18, 2019. In conjunction with this

timetable, Bouchard was to make progress payments in accordance with the following schedule:

| Payment Schedule | Payment Amount | Payment Date |
| --- | --- | --- |
| 8% deposit on contract signing | $336,000 | November 29, 2018 |
| 10% | $420,000 | December 15, 2018 |
| 12% | $504,000 | January 20, 2019 |
| 70% on delivery | $2,940,000 | Delivery of Vessel |

In addition, the contract contained a completion incentive provision. That provision called for Bouchard to pay an additional $70,000 if ISR finished the repairs ten days early, and $100,000 if ISR completed the repairs twenty days early. Even without these incentive payments, ISR expected a 30% profit—$1,260,000—if it completed the project on time.

Between November 29, 2018, and January 11, 2019, ISR prepared the Barge for the work and began making the agreed-upon repairs. Given the size of the Barge, which measures more than 400 feet long and eighty feet wide, that process was not insubstantial. It included ISR hiring at least twenty subcontractors; renting and buying equipment (such as welding machines, lights for nighttime wok, and firefighting equipment); ventilating the tanks; installing hanging staging below the deck; ordering pre-fabricated new plates with underdeck stiffeners; and removing and replacing the old plates with the new ones. To meet the February 18, 2019, deadline, ISR's crew worked ten-hour shifts, seven days a week.

3

During this process, ABS and the Coast Guard boarded the Barge to ensure the deficient steel around the old deck plates had been removed and the new steel plates had been properly installed. While ABS and the Coast Guard conducted these inspections, they identified new work to be completed, including the replacement of additional steel. Bouchard asked ISR to provide a quote for this additional work but ultimately did not authorize ISR to undertake it.

From November 29, 2018, to January 11, 2019, Bouchard made several installment payments to ISR. On January 11, 2019, however, it instructed ISR to cease all work. Bouchard asserts it issued this stop work order because ISR advised that making further repairs at that point would involve additional work outside the contract. Following its stop work order, Bouchard made one or two additional installment payments, bringing the total sum it paid ISR under the contract to $1,810,000.[1] As a result of the stop work order, ISR did not engage in any further work after January 11. The Barge, however, remained berthed at its facility.

On January 31, 2019, ISR invoiced Bouchard for $2,583,762, claiming it had completed 85% of the contracted work. ISR also began charging Bouchard for berthing and other services rendered following the stop work order.

In addition, as noted above, ISR initiated the instant action against the Barge in March 2019. At the same time, ISR filed a motion for issuance of an arrest warrant *in rem* and a motion for appointment of a substitute custodian. The Court granted both

---

[1] The hearing testimony regarding the number and timing of the installment payments made after January 11, 2019, was not entirely clear.

of these motions, directed the Clerk of Court to issue a warrant for the Barge's arrest, and designated ISR as the Barge's substitute custodian. The Barge was arrested on April 5, 2019.

B. 215 Corp. and the Barge itself thereafter moved to vacate the arrest and to set security and countersecurity.[2] At a subsequent evidentiary hearing on these matters, ISR offered the testimony of Bruce Rosen, ISR's project manager who provided Bouchard with a price quotation for the work Bouchard sought to have completed. In response, Bouchard offered three witnesses: Kevin Donohue, Bouchard's Chief Operating Officer (COO), who negotiated the contract; Hugo Ortiz, ISR's Senior Vice President, who oversaw the contract's performance; and Charles Gillespie, an independent surveyor Bouchard retained to evaluate the work ISR had completed. In addition to this testimony, the Court admitted a number of exhibits into evidence.

In accordance with the Court's directive, the parties thereafter submitted proposed findings of fact and conclusions of law. The matter is therefore ripe for the Court's resolution.

II.

*A. Motion to Vacate Arrest*

The Court begins with B. 215 Corp.'s motion to vacate the arrest of the Barge. The Federal Maritime Lien Act, 46 U.S.C. §§ 31341-31343, grants maritime liens to

---

[2] For the sake of simplicity, the Court will refer to the movants as B. 215 Corp.

parties "providing necessaries to a vessel" and allows such parties to bring a civil action *in rem* to enforce the lien. 46 U.S.C. § 31342(a). The purpose of a maritime lien is to allow maritime vessels to continue to move in commerce while precluding them from avoiding their debts simply by leaving the port where the repairs were made. *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 869 (11th Cir. 2010) (citations omitted); *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 519 (2d Cir. 2018).

To secure a maritime lien, "a plaintiff must prove: (1) it provided 'necessaries' (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (citation omitted). Necessaries "includes repairs, supplies, towage, and the use of a dry dock or maritime railway," 46 U.S.C. § 31301(4), as well as berthing, *Am. Eastern Dev. Corp. v. Everglades Marina, Inc.*, 608 F.2d 123, 125 (5th Cir. 1979); *Keefe Kaplan Maritime, Inc. v. Vessel "Cygnet"*, 2018 WL 534300, at *8 (N.D. Cal. Jan. 24, 2018) (collecting cases).

If a lien arises and the vessel is thereafter arrested, a party claiming an interest in the vessel may request a prompt hearing to vacate the arrest. Fed. R. Civ. P. Supp. E(4)(f); M.D. Fla. R. 7.03(g). The purpose of such a post-arrest hearing is to afford due process to the vessel's owner. *S & S Diesel Marine Servs., Inc. v. M/V F–TROOP*, 2011 WL 1899402, at *8 (S.D. Fla. May 18, 2011) (citing *Linea Naviera De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A.*, 1999 WL 33218589, at *2 (M.D. Fla. Nov. 17, 1999)).

At the post-arrest hearing, a lienholder is "required to show why the arrest or attachment should not be vacated or other relief granted consistent with" the federal admiralty rules. Fed. R. Civ. P. Supp. E(4)(f). Of significance here, however, the post-arrest hearing "is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond." *S & S Diesel*, 2011 WL 1899402, at *8 (quoting *Salazar v. Atlantic Sun*, 881 F.2d 73, 79 (3d Cir. 1989)). Indeed, the Eleventh Circuit has cautioned against district courts conducing a "mini-trial" at this stage of the case. *PDS Gaming Corp. v. M/V Ocean Jewell of St. Petersburg*, 2007 WL 2988798, at *1 (11th Cir. 2007). A lienholder's burden at the post-arrest hearing is "not onerous." *S & S Diesel*, 2011 WL 1899402, at *9 (citing *George v. A 2005 Donzi Motor Yacht, Hull Identification Number DNAFA 008A505*, 2009 WL 3417707, at *1 (S.D. Fla. Oct. 22, 2009)).

Applying these principles here, ISR has met its burden of demonstrating reasonable grounds for the Barge's arrest. The Court finds in this regard that, based on its evaluation of the testimony and exhibits presented at the hearing, there is sufficient evidence at this preliminary juncture showing that ISR: made repairs to the Barge, which would have assisted the vessel in performing its function; charged Bouchard a reasonable price for performing such work; conducted that work at Bouchard's direction; and remains owed a substantial sum in return.

B. 215 Corp.'s efforts to undermine this finding are unavailing. B. 215 Corp. initially moved to vacate the Barge's arrest on the grounds that ISR breached the

contract by repeatedly attempting to perform work on the Barge in excess of that specified in the contract. B. 215 Corp., however, abandoned that argument at the hearing and now seeks to rely instead on a theory of commercial frustration. B. 215 Corp. contends in this regard that the contract was thwarted by the additional repair work ABS and the Coast Guard identified, thereby relieving both parties of their contractual obligations. As a result, B. 215 Corp. asserts ISR is only entitled to recover in *quantum meruit* for the services performed prior to the stop work order. B. 215 Corp. further asserts that, because *quantum meruit* is less than the $1,810,000 already paid to ISR,[3] it owed no debt to ISR at the time of the arrest and there was accordingly no basis for the maritime lien.

The threshold problem with B. 215 Corp.'s argument is that it misapprehends the Court's limited role at this stage of the case. The Court's role is not, as B. 215 Corp. suggests, to resolve contested factual disputes and complex legal issues that would effectively convert the instant proceedings into the very type of mini-trial the Eleventh Circuit has cautioned against. *PDS Gaming Corp.*, 2007 WL 2988798, at *1; *see also Am. Overseas Marine Co., LLC v. M/V Seattle*, 2016 WL 8607581, at *3 (M.D. Fla. Dec. 20, 2016) ("The factual development required to resolve the[ ] questions [before the Court on the motion to vacate arrest] would force the Court to engage in the sort of 'mini-trial' that it is not permitted to do in determining whether an arrest should be vacated."); *Turner v. Neptune Towing & Recovery, Inc.*, 2010 WL 11651429, at

---

[3] Relying on Gillespie's testimony, the defense claims that *quantum meruit* equals $1,596,000.

<mark>8</mark>

*6 (M.D. Fla. Feb. 9, 2010) (citation omitted) (providing that the purpose of a post-arrest hearing is to evaluate whether the plaintiff's evidence amounts to probable cause, not to resolve disputed issues of material fact); *Greger Leasing Corp. v. Barge PT. Potrero*, 2006 WL 889537, at *3 (N.D. Cal. Apr. 5, 2006) ("Despite the repeated efforts of the parties to turn a limited adversary hearing into a full-blown trial on the merits, the Court's inquiry at this point remains focused on the narrow issue of whether Plaintiff has demonstrated probable cause to believe a lien exists.").

Even a cursory examination of B. 215 Corp.'s belated frustration argument reveals the perils of attempting to address such a theory on the limited record currently before the Court. According to the case authority cited by B. 215 Corp., the doctrine of frustration has three elements: (1) "the event giving rise to the claim must be totally unexpected and unforeseeable;" (2) "the risk of the event must not be provided for, either by the language of the [contract] or by custom;" and (3) "the performance of the contract must be impossible or commercially impracticable." (Doc. 56 at 14-15) (citing *Hilton Oil Transport v. Oil Transport Co., S.A.*, 659 So. 2d 1141, 1147 (Fla. Dist. Ct. App. 1995)).

Beginning with the first element, it is evident B. 215 Corp. anticipated that additional work could potentially arise during the performance of the contract. Afterall, it included a "no growth" clause in its agreement with ISR that required it to approve any such additional work in advance. The question posed here is whether the non-contracted work identified by ABS and the Coast Guard was wholly unexpected

9

and unforeseeable. The evidence on this issue is insufficient at this preliminary juncture.

There was scant testimony at the hearing, for example, as to what ABS and the Coast Guard discovered regarding the condition of the Barge when they inspected it in South Carolina, and what specific discussions they had with B. 215 Corp. prior to Bouchard's execution of the contract with ISR. This gap in the evidence is particularly noteworthy considering the parties' conflicting positions on whether ABS and the Coast Guard advised Bouchard before work commenced that repairs outside of the contract, including additional steel replacement, should be done.

The record is similarly underdeveloped regarding what B. 215 Corp. independently knew or should have known about the condition of the Barge, particularly since it owned the vessel. The Court notes in this regard that, according to Donohue (Bouchard's COO), B. 215 Corp. previously ran into a similar scenario with a sister barge. The evidence before the Court, however, does not illuminate whether and to what extent this prior incident put B. 215 Corp. on notice that the additional work identified by ABS and the Coast Guard here was to be expected.

Resolution of the second element is likewise difficult to resolve at this stage. As noted above, the authority upon which B. 215 Corp. relies states that the risk of the event at issue must not be covered either by contract or "by custom." There was no evidence adduced at the hearing addressing the degree to which the likelihood of the non-contracted work here was provided for "by custom."

Deciding the third prong is also problematic. Although there was testimony at the hearing, including from Rosen, that performance of the contract at the time of the stop work order was commercially impracticable, there was also testimony that B. 215 Corp. could have reduced the cost of the additional repairs identified by ABS and the Coast Guard by agreeing to do them earlier in the process. In addition, there was testimony that at least some of these repairs were only recommended, not required, by ABS and the Coast Guard. Such evidence is potentially significant because "courts are reluctant to excuse performance that is not impossible but merely . . . profitless[ ] and expensive"—that is, "it must be positively unjust to hold the parties bound." *Elof Hansson Paper & Board, Inc. v. Caldera*, 2012 WL 12865853, at *8 (S.D. Fla. Apr. 26, 2012) (quoting *Valencia Ctr., Inc. v. Publix Supermarkets, Inc.*, 464 So. 2d 1267, 1269 (Fla. Dist. Ct. App. 1985); *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 438 (S.D. Fla. 1975)); s*ee also Am. Trading & Pro. Corp. v. Shell Int'l. Mar., Ltd.*, 453 F.2d 939, 942 (2d Cir. 1972) ("Mere increase in cost alone is not a sufficient excuse for non-performance. It must be an 'extreme and unreasonable' expense.") (quoting Restatement (First) of Contracts §§ 467, 454 (1932)). The Court cannot determine based on the limited record before it whether it would be "positively unjust" to deem Bouchard bound by the contract.

In sum, resolution of the parties' disputes, including their legal and factual disagreements as to whether the contract has been breached, its enforceability, and the percentage and value of the work completed by ISR, are better left for trial. *Jaffe v. M/S Breaking Wind*, 2017 WL 7731867 (S.D. Fla. June 13, 2017), at *5 (explaining

that the factual and legal issues revealed at the hearing, including whether an agreement was breached, resulted in a "multitude of unanswered questions" that indicated "the propriety of [the] arrest at [that] time."); *Diesel Specialists, LLC v. M/V Mohawk Traveler*, 2009 WL 1036085, at *2 (E.D. La. Apr. 17, 2009) (observing that parties' differing interpretations of their contract and the extent of performance "simply indicate a factual dispute regarding the completeness of the repairs that is not resolvable on a motion to vacate"); *Fields v. Am. Gulf Lines, Inc.*, 1998 WL 276219, at *2 (E.D. La. May 28, 1998) (declining to address defendant's claim it did not breach the parties' contract as a question not properly before the court in deciding a motion to vacate the vessel's attachment).

It bears emphasizing that the Court is not making a determination as to whether ISR will ultimately prevail on its claim. Such matters must be resolved in subsequent proceedings. *Jaffe*, 2017 WL 7731867, at *5 (finding it sufficient that the plaintiff had "established a prima facie case for an action in rem, even though the ultimate result of the case may be different").

### B. Motion for Security and Countersecurity

Turning to B. 215 Corp.'s motion for security and countersecurity, "Supplemental Admiralty Rule E(5)(a) provides for the release of an arrested vessel on the giving of security, to be approved by the court or clerk." *S&S Diesel*, 2011 WL 1899402, at *11 (internal quotation marks omitted). Rule E(5)(a) states, in pertinent part:

> Whenever . . . process in rem is issued the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by stipulation of the parties, conditioned to answer the judgment of the court or of any appellate court. The parties may stipulate the amount and nature of such security. In the event of the inability or refusal of the parties so to stipulate the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller.

Fed. R. Civ. P. Supp. E(5)(a).

In this case, the parties do not stipulate to security. Denying that ISR is entitled to a lien, B. 215 Corp. sees no reason for the Court to require security for the Barge's release. Indeed, B. 215 Corp. opted not to address the matter of security at all in its post-hearing submission.

ISR, on the other hand, requests that the Court set security at $3,722,899. ISR arrives at this sum by adding the following figures (which it asserts are supported by Rosen's testimony) and then subtracting the $1,810,000 B. 215 Corp. has already paid it: $2,790,505 in actual labor, materials, and equipment costs; $1,260,000 in projected profit; $100,000 for completing the project early; $208,930 in berthing and related services for the time period between the stop work order and arrest; $31,193 in interest accrued due to late payments; $231,000 for the staging rental that remained in place after the stop work order until the arrest; $236,480 in substitute custodian costs incurred until the date of the hearing, along with additional daily costs as this action

proceeds; and post-arrest interest of $674,791 under Local Admiralty Rule 7.05(i)(1)(A).

In light of the parties' failure to stipulate to the amount of security, it falls to the Court to place a reasonable value on ISR's claim. *20th Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1429, 1431 (M.D. Fla. 1997) ("Where the claim is unliquidated and the parties cannot agree as to the amount of the bond, it will be incumbent upon the court to make some effort to place a reasonable value on the claim.") (quoting 7A Moore's Federal Practice 2d Ed.). This exercise requires some prefatory observations.

This action is an *in rem* claim against the Barge itself, not an *in personam* action against B. 215 Corp. Thus, it is unclear at this point whether certain components of ISR's calculation should be included in the amount of appropriate security. *See S.E.L. Maduro (Florida), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987) (distinguishing the primary right at stake and potential liabilities in a breach of contract claim against vessel owner *in personam*—the right to the benefit of one's bargain—from the primary right at stake in an action to enforce a maritime lien—the right to be compensated for services rendered).

The issue of security is further complicated by the fact that ISR has recently moved for the Barge's interlocutory sale due to its deteriorating condition. (Doc. 62). In that motion, ISR describes the extent of this deterioration in detail and adds that the Barge was in a state of disrepair even at the time of its arrest.

Based on the above considerations and with a particular mind to the fact that the principal sum of the bond shall not exceed the Barge's duly appraised value and that equitable principles underlie admiralty actions, *S & S Diesel*, 2011 WL 1899402, at *13 (citation omitted), the Court fixes security for the Barge's release at $1,711,379.40. This figure is supported by the evidence and reflects ISR's claimed costs incurred in repairing the Barge and providing berthing and related services (minus the $1,810,000 already paid), as well as $236,480 in substitute custodian costs between the date of the arrest and the hearing. And, pursuant to Local Admiralty Rule 7.05(i)(1)(A), it includes $285,464.40 in interest.[4]

This security amount, however, does not include ISR's projected profit, performance bonus, or claimed interest on additional contractual payments, as these sums are too speculative at this stage. *See Julien v. M/V Pacific II*, 2010 WL 1850359, at *1 (S.D. Fla. May 7, 2010) (citations omitted) (noting that the court "clearly has discretion" in applying Rule E(5)(a) to determine the reasonable value of a claim). The Court also declines to adopt the entirety of ISR's proposed figures because it is not clear, as noted above, whether ISR is entitled to the full contract amount given that this is an *in rem* action.

The Court likewise excludes from the bond amount ISR's claimed staging costs, as the evidence tendered in this regard shows that these costs were included in the contract and ISR was not paying rental fees on those costs. In addition, custodial

---

[4] To reach this interest amount, the Court used a remaining balance of $1,189,435 based on the repair, berthing, and related costs set forth above.

charges incurred from the date of the hearing that are not wholly attributable to the parties' actions have been omitted. *20th Century Fox*, 992 F. Supp. at 1433 (disallowing certain requested charges due to the equitable concern that part of the custodian's requested charges were incurred because the court allowed the parties additional time after the hearing to tender additional support for their arguments).

The security sum is set without prejudice to a final binding determination as to the value of ISR's claim.[5]

The Court, however, will not require ISR to post countersecurity pursuant to Supplemental Rule E(7).[6] The purpose of countersecurity under this rule is to "place the parties on an equality as regards security." *Afram Lines Int'l, Inc. v. M/V Capetan Yiannis*, 905 F.2d 347, 349 (11th Cir. 1990) (quotation omitted). In evaluating the need for countersecurity, the Court "retains broad discretion" as to how best to "effectuate this purpose." *Id*. (citations omitted).

Here, B. 215 Corp. maintains that ISR should be directed to post countersecurity to cover the loss B. 215 Corp. suffered during the arrest period when

---

[5] In seeking a higher bond, ISR argues in part that its ultimate recovery against the Barge would be limited to the bond amount. (Doc. 57 at 14) (citing *S & S Diesel*, 2011 WL 1899402, at *12 and *20th Century Fox*, 992 F. Supp. at 1434). But, as the court in *S & S Diesel* explained, the Eleventh Circuit has approved awards in excess of bond amounts where such sums were not set relative to the vessel's value and the parties failed to stipulate to them. 2011 WL 1899402, at *12.

[6] Supplemental Admiralty Rule E(7) provides, "[w]hen a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim, unless the court, *for cause shown,* directs otherwise." Fed. R. Civ. P. Supp. E(7)(a) (emphasis supplied).

it could not use the Barge. The evidence adduced at the hearing, however, did not support this contention. Donohue testified that, given the additional repair work ABS and the Coast Guard identified, the Barge had "no chance of getting class certification" even if ISR had completed all of the contractual repairs. With respect to B. 215 Corp.'s counterclaims, Donohue further testified that ISR did not do anything that caused the Barge to lose $25,000 per day in revenue. Accordingly, the Court finds that the posting of countersecurity is unwarranted.

III.

In light of all of the above, it is hereby ORDERED:

1. *Defendant's Motion to Vacate Arrest* (Doc. 19) is denied;

2. *Defendant's Motion to Set Security and Counter Security* (Doc. 26) is granted in part and denied in part;

3. For release of the Barge, the Defendant shall be required to post security in the amount of $1,711,379.40, which is to be deposited into the Court registry in accordance with this Court's Local Admiralty Rules; and

4. No countersecurity is required.

DONE and ORDERED in Tampa, Florida, this 14th day of November 2019.

_____
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record